# In the United States District Court
# for the Southern District of Georgia
# Augusta Division

| | | |
|---|---|---|
| FPL FOOD, LLC, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| UNITED STATES DEPARTMENT | * | CV 107-154 |
| OF AGRICULTURE, CHUCK CONNER, | * | |
| Acting Secretary, United | * | |
| States Department of | * | |
| Agriculture, and GARY | * | |
| CASELLA, in his official and | * | |
| individual capacity, | * | |
| | * | |
| Defendants. | * | |

## ORDER

Presently before the Court is Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint. (Dkt. # 46.) According to the allegations of FPL's Second Amended Complaint, a United States Department of Agriculture ("USDA") inspector assigned to ensure regulatory compliance at a beef processing plant sexually harassed and retaliated against the employees of that plant. The harassment and retaliation allegedly continued from 2004 to 2007. In November 2007, the processing plant, FPL Food, LLC, filed this action. FPL's Second Amended Complaint asserts claims against the USDA, USDA Acting Secretary Chuck Conner in his official capacity, and the inspector, Gary Casella, in his official and individual capacities. All Defendants have moved to dismiss the Complaint in its entirety.

The Complaint asserts seven counts: (1) review of agency action under the Administrative Procedures Act; (2) declaratory relief under the Declaratory Judgment Act; (3) a *Bivens* claim predicated upon Casella's alleged violation of FPL's employees' First Amendment rights; (4) a *Bivens* claim predicated upon Casella's alleged violation of FPL's employees' Fifth Amendment rights; (5) injunctive relief pursuant to a state-law trespass claim; (6) money damages pursuant to a state-law interference with contract claim; and (7) fees and costs. In its general prayer for relief, FPL asks for damages, fees, and an injunction prohibiting Casella's return to FPL. The Court **GRANTS** Defendant's Motion to Dismiss as to Counts Two, Three, and Four, and **DENIES** it as to Counts One, Five, Six, and Seven. The Stay of Proceedings pending consideration of Defendants' Motion for Reconsideration of the Court's prior order is hereby **LIFTED**. The prior order, issued February 4, 2009, is hereby withdrawn and replaced in its entirety with this Order.

## FACTUAL ALLEGATIONS

The following factual allegations are taken from FPL's Complaint and attached documents. FPL's allegations begin with the contention that USDA inspector Gary Casella sexually harassed Maureen Mata, a female employee of FPL. Ms. Mata states that in the fall of 2004, Casella began commenting on her looks. According to Ms. Mata, Casella would routinely tell her that she was "pretty," that he liked the way she looked, and that she looked good in a specific pair of pants. (2d Am. Compl. ¶ 7(a).) Ms. Mata further avers that, although she asked Casella to stop making such comments, he continued to make them through May 2007. (Mata

Decl. ¶ 4; 2d Am. Compl. ¶ 7.)[1]  She recalls that Casella "would also brush up against me, touch me, and invade my personal space." (Mata Decl. at ¶ 6.)

In addition to these remarks, Ms. Mata describes several encounters with Mr. Casella. Ms. Mata recounts that, in the fall of 2004, Casella asked to meet with her because "his wife was going out of town." (*Id.* at ¶ 5.)  She further claims that in early 2005, Mr. Casella walked by her with an inspection hook and made a masturbation gesture with his hand on the pole of the hook. (*Id.* at ¶ 7.)  Next, during the summer of 2005, Mr. Casella allegedly told Ms. Mata, "I wish I could put my head between your legs." (*Id.* at ¶ 8.)

FPL further alleges that in late 2005, Mr. Casella walked by Ms. Mata and brushed his hand against her buttocks.  Another FPL employee, Sophia Blockett, avers that she saw the incident and asked Ms. Mata why she did not report Casella's misconduct.  According to Ms. Blockett, Ms. Mata replied that she did not want anyone to lose their job.  Specifically, Ms. Mata stated that Mr. Casella previously told her that he had the power to shut down the plant. (*See* Mata Decl. ¶ 9; Blockett Decl. ¶ 7.)  Ms. Mata and Ms. Blockett also report that Mr. Casella would visit Ms. Mata's work station at least two to three times per day and stare at her for ten to fifteen minutes at a time. (Mata Decl. ¶ 12; Blockett Decl. ¶¶ 8-9.)  Ms. Mata also relates that, on several occasions, Mr. Casella made sexual gestures toward her with his tongue. (Mata Decl. ¶ 13.)

Ms. Mata and another FPL employee, Angel Aviles, recount an occasion in the summer of 2006 when Mr. Casella walked up behind Ms. Mata, put his hand in her lab coat pocket, and rubbed his hand against her leg.  Mr. Aviles, who has since married Ms. Mata, witnessed the incident and recalls confronting Mr. Casella.  Mr. Casella reportedly told Mr. Aviles he was

---

[1] All of the declarations and affidavits cited were attached to the Complaint, so the Court may consider them in ruling on a motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509 (2007).

putting ice in Ms. Mata's pocket to "cool her down." Mr. Aviles told Mr. Casella to "back off" and never touch her again. According to Mr. Aviles, Mr. Casella replied, "You can't threaten me. I'm the USDA." (*See* Mata Decl. ¶ 11; Aviles Decl. ¶¶ 4-5.)

FPL also alleges that Mr. Casella retaliated against Mr. Aviles. (2d Am. Compl. ¶ 9.) FPL alleges that shortly after Mr. Casella's confrontation with Mr. Aviles, Mr. Casella began to focus inordinately on inspecting Mr. Aviles's work. According to FPL, Mr. Aviles's work came under such intense scrutiny by Mr. Casella that FPL had to move Mr. Aviles to another workstation. Mr. Casella's inspection of Mr. Aviles's former workstation reportedly dropped off immediately after the move. (Aviles Decl. ¶¶ 7-8.)

After Mr. Aviles was transferred, Mr. Casella allegedly intensified his scrutiny of Mr. Aviles's new post. Specifically, FPL alleges that Mr. Casella declared a product to be contaminated even though three other experienced individuals, including one USDA inspector, found the product contaminant-free. As a result, FPL claims, management was again forced to rotate Mr. Aviles among assignments so that he did not stay in any single area long enough for Mr. Casella to focus all his retaliatory efforts on any one station. Mr. Aviles reported that he was afraid Mr. Casella's conduct would lead to his termination. (2d Am. Compl. ¶ 13, Aviles Decl. ¶¶ 8-10.)

FPL alleges that, by intimidating employees and necessitating the internal reshuffling of FPL's work force, Mr. Casella's misconduct diminished plant productivity and caused FPL economic loss. (2d Am. Compl. ¶¶ 43, 54.)

FPL also alleges that Mr. Casella acted in a racially discriminatory manner, contaminated items as he inspected them, and otherwise distracted FPL employees by discussing sexual matters. (2d Am. Compl. ¶¶ 8, 10, 11.)

**ADMINISTRATIVE BACKGROUND**

Congress enacted the Federal Meat Inspection Act ("the Act") in 1907 in response to unsanitary conditions in the meat-packing industry. The purpose of the Act is to assure that meat and meat food products are "wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 602. The Act directs the USDA to inspect the sanitary conditions of meat processing plants and to "prescribe the rules and regulations of sanitation under which such establishments shall be maintained." 21 U.S.C. § 608. The Act grants the USDA the authority to "make such rules and regulations as are necessary for the efficient execution" of the Act. 21 U.S.C. § 621. The USDA has delegated its inspection and enforcement authority under the Act to the Federal Safety and Inspection Service (FSIS). The FSIS sends inspectors to FPL, and FPL is legally obligated to allow them access to the plant. 9 C.F.R. § 300.6.

As part of the inspection process, the FSIS inspectors issue "noncompliance records" when they identify deviations from a plant's regulatory obligations. Mr. Casella's job involves issuing such noncompliance records. Industry members seeking to appeal those noncompliance records pursuant to 9 C.F.R. § 306.5 should appeal directly up the USDA's chain of authority by appealing each regulatory decision to the decision maker's immediate supervisor. In accordance with this process, an industry member contesting an inspector's noncompliance record would appeal first to the in-plant Inspector in Charge, then to the Frontline Supervisor, then to the District Manager, and then to the Executive Associate for Regulatory Operations (EARO) in Washington.

In addition to the regulations published in the Code of Federal Regulations, the FSIS issues official communications and instructions to its staff in the form of guidance documents known as "Directives." Directives are instructions written to FSIS employees to implement the

USDA's policies and procedures. One such directive, FSIS Directive 4735.7, allows a member of the meat-processing industry, like FPL, to file an administrative complaint against an USDA employee. The Directive prescribes a simple administrative appeal process for members of the regulated industry who are dissatisfied with the USDA's resolution of their complaints about USDA personnel.

FPL filed a complaint against Mr. Casella under FSIS Directive 4735.7. The USDA determined that it would return Casella to FPL based in part on the erroneous belief, relayed to FPL orally, that Ms. Mata no longer worked for FPL. (2d Am. Compl. ¶ 14.) FPL appealed that decision. (2d Am. Compl. at ¶ 15.) The end result of FPL's administrative complaint and appeal was a letter from the USDA stating that the USDA "f[ound] that the allegations of misconduct against Mr. Casella have not been substantiated." (2d. Am. Compl. Ex. 16). The letter concluded that "[a]lthough FSIS does not currently plan on assigning [Casella] to FPL, please be advised that staffing needs could result in his assignment to conduct investigation activities at FPL at some future date." (*Id.*)

Defendants concede that FPL has exhausted its administrative remedies under Directive 4735.7. (Def.'s Br. in Supp. 31.)


**PROCEDURAL BACKGROUND**

FPL brought suit against the USDA, the USDA Secretary, and Inspector Casella. Certifying that Mr. Casella was acting in the scope of his employment when his alleged misconduct occurred, Defendants filed a "Notice of Substitution" to substitute the United States of America as a defendant in the stead of Gary Casella. (Def.'s Notice of Substitution); *see* 28 U.S.C. § 2679(d)(1). Defendants cited the Westfall Act of 1988 for authority to make this

substitution. *See* § 2679(d)(1). FPL challenged the Westfall Certification, averring that Casella was acting outside the scope of his employment when he committed the alleged acts. (Pl.'s Opp'n to Notice of Substitution); *see S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1542-44 (11th Cir. 1990). FPL requested an evidentiary hearing. The Court has not yet determined whether Casella was acting in the scope of his employment when he committed the acts in question.

After filing the Notice of Substitution, Defendants filed this Motion to Dismiss. Defendants seek the dismissal of all of Plaintiff's claims on myriad grounds, including lack of standing, sovereign immunity, failure to exhaust administrative remedies, the commission of agency action to agency discretion under the Administrative Procedure Act (APA), the existence of special factors counseling hesitation in recognizing a *Bivens* remedy, and qualified immunity.

The Court **GRANTS** Defendants' Motion as to FPL's Declaratory Judgment Act claim (Count Two) and *Bivens* claims (Counts Three and Four); and **DENIES** it as to FPL's APA claim (Count One), state law claims (Counts Five and Six), and attorney's fees claim (Count Seven). The Court first addresses Defendant's sovereign immunity argument, then examines each Count in turn.

**DISCUSSION**

**I.    Sovereign Immunity**

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260, 119 S. Ct. 687 (1999). "Any waiver of sovereign immunity must be unequivocally expressed in statutory text and will be

strictly construed, in terms of its scope, in favor of the sovereign." *Gomez-Perez v. Potter*, 128 S. Ct. 1931, 1942 (2008).

Defendants argue that sovereign immunity bars some of FPL's claims. Because it is not clear exactly which claims Defendants thinks are barred by sovereign immunity, the Court will address all of them. (Def.'s Br. in Supp. 21, 25-26, 28-29, 36 n.22.)

Count One seeks review of agency action under the APA. 5 U.S.C. §§ 701-706. The APA waives sovereign immunity as to any "action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity." 5 U.S.C. § 702; *see Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1555 (11th Cir. 1985). Because Count One seeks only nonmonetary relief and alleges misconduct on the part of an agency, it is not barred by sovereign immunity.

Count Two seeks relief under the Declaratory Judgment Act (DJA), 28 U.S.C. §§ 2201-2240. The DJA is not itself a waiver of sovereign immunity, so a plaintiff suing under the DJA must show that the government has waived its immunity in some other way. *Harbert v. United States*, 206 F. App'x 903, 908 (11th Cir. 2006) (unpublished opinion); *see Household Bank v. JFS Group*, 320 F.3d 1249, 1253 (11th Cir. 2003) ("[T]he operation of the Declaratory Judgment Act is procedural only"). The APA's waiver of sovereign immunity can waive immunity not only as to claims invoking the procedures set out in the APA, but also as to claims for declaratory judgment seeking only injunctive relief against government agencies. 5 U.S.C. § 702; *Transohio Sav. Bank v. Dir. of Thrift Supervision*, 967 F.2d 598, 607 (D.C. Cir. 1992). "[T]he waiver of sovereign immunity contained in section 702 [of the APA] is not dependent on application of the procedures and review standards of the APA. It is dependent on the suit against the government being one for non-monetary relief." *Red Lake Band of Chippewa*

*Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988). Because Count Two alleges agency misconduct and seeks only injunctive relief, the APA waiver applies. Sovereign immunity does not bar Count Two.

Counts Three and Four are *Bivens* claims seeking money damages. Because the *Bivens* claims have been asserted against Casella in his individual capacity, they are not barred by sovereign immunity. *Bolin v. Story*, 225 F.3d 1234, 1238 n.4 (11th Cir. 2000) (sovereign immunity does not protect defendants sued in their individual capacities); *Boda v. United States*, 698 F.2d 1174, 1176 n.3 (11th Cir. 1983) (applying same rule in *Bivens* context); *see also Carlson v. Green*, 446 U.S. 14, 19, 100 S. Ct. 1468 (1980).

Counts Five and Six assert state-law claims for trespass and interference with contract against Mr. Casella in his individual capacity. It would be premature to decide whether sovereign immunity bars these claims because the Court has not yet determined whether Casella was acting within the scope of his employment when he committed the acts that gave rise to this litigation. (*See* Pl's Req. for Evidentiary Hr'g); *see also Lehtinen*, 913 F.2d at 1544. If Casella was acting outside the scope of his employment, then the claims may proceed against him in his individual capacity. If Casella was acting within the scope of his employment, however, then the claims must be brought against the United States and consideration of sovereign immunity will be proper. The Court will hold the requested hearing on this issue at a time to be determined after additional consultation with the Parties.

## II.    Count One

In Count One, FPL seeks judicial review under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*; of the USDA's finding that Mr. Casella did not commit any wrongdoing while at FPL's facility. (2d Am. Compl. ¶ 26.) FPL alleges that the USDA "failed to enforce

[FSIS] Directive 4735.7" and that its decision was arbitrary and capricious. (2d Am. Compl. ¶¶ 29-31.) FPL seeks a declaration that "the USDA failed to enforce . . . Directive 4735.7," that the USDA's decision to take no action against Mr. Casella be overturned, and that the USDA be enjoined from assigning Mr. Casella to FPL. The USDA moves to dismiss Count One on the grounds that FPL lacks standing, the USDA's actions were "committed to agency discretion by law,"[2] and FPL has not exhausted its administrative remedies.

In the Court's initial order, which has been withdrawn, the Court dismissed Count One on the ground that the USDA's action was "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). After a thorough review and reconsideration, the Court has determined that this holding was erroneous. The Court holds that FPL has alleged sufficient facts to establish standing, that FSIS Directive 4735.7 is binding on Defendants, and that FPL has exhausted its administrative remedies. The Court therefore **DENIES** Defendants' Motion to Dismiss Count One.

### A. Standing

Because Mr. Casella challenges standing via a motion to dismiss, FPL "may establish standing based on general factual allegations of injury." *Young Apartments v. Town of Jupiter*, 529 F.3d 1027, 1038 (11th Cir. 2008).[3] The Court must also presume that FPL's "allegations are sufficient to establish the facts alleged." *Id.* The Court, however, is not required to accept legal

---

[2] 5 U.S.C. § 701(a)(2).

[3] The Court recognizes that standing is part of the Article III jurisdictional inquiry, and that Defendants may make either a facial or factual attack on jurisdiction. *See Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279-80 (11th Cir. 2009). However, the Parties have not completed discovery, Defendants have not filed an answer, and neither party has submitted evidence outside of the Complaint related to standing. The standing issue in this case also involves factual determinations common to the merits of the case – whether the USDA's no action determination and findings of fact were arbitrary and capricious. When a 12(b)(1) motion to dismiss for lack of jurisdiction "implicate[s] the merits of [the case]," the Court must treat the motion under the Rule 12(b)(6) or Rule 56 standard. *Morrison v. Amway Corp.*, 323 F.3d 920, 923-24 (11th Cir. 2003). The Court will therefore treat this as a facial attack on standing and judge it under the Rule 12(b)(6) standard. Nothing in this Order should be construed as precluding a factual attack after discovery is complete.

conclusions and conclusory statements as true. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-51 (2009) (discussing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S Ct. 1955 (2007)).

Every plaintiff must satisfy the Article III "case or controversy" standing requirements. *See Young Apartments*, 529 F.3d at 1038 (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197 (1975)). The Article III requirements are that "(1) [the plaintiff] has suffered an actual or threatened injury, (2) that the injury is fairly traceable to the challenged conduct of the defendant, and (3) that the injury is likely to be redressed by a favorable ruling." *Id.* (quoting *Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir. 1994)). These requirements are constitutional, and the Court cannot proceed unless they are satisfied. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S. Ct. 693 (2000).

The injury-in-fact requirement is somewhat modified when a plaintiff seeks an injunction. An injunction can only issue when the plaintiff either shows a threat of irreparable injury or a likelihood of future injury. FPL relies on the latter, arguing that it will face economic injury if Mr. Casella is reassigned to its facility. The Supreme Court held in *Lujan v. Defenders of Wildlife* that the alleged injury must be "actual or imminent, not conjectural or hypothetical." 504 U.S. 555, 560, 112 S. Ct. 2130 (1992) (internal quotation marks omitted). To satisfy this requirement, FPL must allege facts that, if true, would show that the future injury is both imminent and substantially likely to occur. *See Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008). Probabilistic harm is, however, "enough injury in fact to confer [] standing in the undemanding Article III sense." *Id.* at 1163 (internal quotations marks omitted).

"An imminent injury is one that is 'likely to occur immediately.'" *Id.* (quoting *31 Foster Children v. Bush*, 329 F.3d 1255, 1265 (11th Cir. 2003)). The imminence requirement is meant

to ensure that courts hear actual disputes between adverse parties, as required by Article III. *Id.* It is not a rigid requirement that the injury occur "precisely within a certain number of days, weeks, or months." *Browning*, 522 F.3d at 1163. The Eleventh Circuit has held that plaintiffs seeking an injunction prohibiting the Secret Service from restricting future protests against President George W. Bush to designated "free speech zones" did not satisfy this requirement, *Eland v. Basham*, 471 F.3d 1199, 1205-07 (11th Cir. 2006), but that voters' rights organizations challenging a Florida voter registration law did. *Browning*, 522 F.3d at 1161. This case falls somewhere in between.

The plaintiffs in *Eland* failed to allege when, where, and how future protests would occur. *Eland*, 1206-07. That defect was particularly significant since the constitutionality of the future restrictions on speech at issue depended on the time, place, and manner of the speech. *Browning*, 522 F.3d at 1161. By contrast, the plaintiffs in *Browning* alleged "when and in what manner the alleged injuries are likely to occur": on election day by being wrongfully denied the right to vote. *Id.* FPL alleges that it will suffer a future economic injury if Mr. Casella is reassigned to FPL. FPL has alleged the manner in which the alleged injuries are likely to occur, but not the date. There are, however, enough clues in Cheryl Hicks's December 17 letter to FPL's counsel to find that the imminence requirement is met at this stage of the litigation.

In that letter, Ms. Hicks informed FPL's counsel that although she concluded that FPL's allegations of misconduct were unfounded, she was not reassigning Mr. Casella to FPL *at that time*. (2d Am. Compl. Ex. 16, 6.) The reasons she gave were that FPL's allegations and lawsuit were made public by a local newspaper and that she needed to protect Mr. Casella "from the hostile work environment that may have resulted from these events and the publicity surrounding them." (*Id.*) Ms. Hicks further wrote that "[a]lthough FSIS does not currently plan on assigning

him to FPL, please be advised that staffing needs could result in his assignment to . . . FPL at some future date." (*Id.*) Dr. Larry Smith of the FSIS wrote to FPL in a letter dated November 15, 2007 that he was reassigning Mr. Casella to FPL because he could "no longer justify . . . detailing Mr. Casella" away from FPL. (2d Am. Compl. Ex. 14, 2.) Dr. Smith cited as reasons for this determination the "great personal hardship" to Mr. Casella and "significant fiscal burden on . . . the Agency" in assigning Mr. Casella to another plant. (*Id.*)[4] The USDA has made similar statements regarding the hardship to Mr. Casella in filings with this Court.

These letters create a reasonable inference that the agency would reassign Mr. Casella to FPL's facility after this litigation ends, unless the Court issues an injunction. Dr. Smith's letter and Defendants' filings with this Court suggest that Mr. Casella and the Agency would prefer to assign Mr. Casella to FPL's facility. Ms. Hicks's letter suggests that the only reason Mr. Casella was not reassigned to FPL was the potentially hostile work environment brought on by the events surrounding this lawsuit. These two letters permit the inference that Mr. Casella would be reassigned to FPL as soon as the work environment permits. Ms. Hicks's letter indicates that that would happen once the lawsuit is resolved. The Court can therefore infer that the injury that FPL foresees would occur soon after the conclusion of this lawsuit. That is enough to satisfy the imminence prong, at this stage of the litigation.

Having found that the "imminent" prong is satisfied, the Court now turns to the "substantial likelihood" prong. "To be likely enough, the threatened injury must pose a 'realistic danger' and cannot be merely hypothetical or conjectural." *Browning*, 522 F.3d at 1161. FPL's allegation of future injury depends on two contingencies: (1) the USDA reassigning Mr. Casella to FPL and (2) Mr. Casella continuing to harass and retaliate against FPL employees.

---

[4] Both of these letters were attached as exhibits to FPL's Second Amended Complaint, so the Court may properly consider them. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509 (2007).

Defendants argue that this chain of events is too speculative to meet the substantial likelihood requirement. Defendants also point out that, because Mr. Casella is a government actor, "there is a rebuttable presumption that the objectionable behavior will not recur." *Troiano v. Supervisor of Elections in Palm Beach County*, 382 F.3d 1276, 1283 (11th Cir. 2004).

As to the first contingency, FPL has sufficiently alleged facts that create a substantial likelihood that the USDA will reassign Mr. Casella to FPL. Defendants have steadfastly maintained that they have the right to reassign him to FPL. (*See, e.g.*, 2d Am. Compl. Ex. 16, 6; Ex. 14, 2.) Ms. Hicks set forth in her letter to FPL's counsel the reasons Mr. Casella was not being reassigned to FPL, none of which involve the substance of FPL's allegations of misconduct. (2d Am. Compl. Ex. 16, 6.) Rather, Ms. Hicks stated in the letter that Mr. Casella was not being reassigned at that time so that he would not be subjected to a hostile work environment. (*Id.*) Ms. Hicks also indicated in the letter that the current litigation is a significant source of the potential hostility. Defendants have clearly indicated that, all else equal, they would prefer to reassign Mr. Casella to FPL. The Court therefore concludes that Mr. Casella is likely to be reassigned to FPL's facility when the Agency is no longer concerned about workplace hostility towards him, and that such hostility will cease – in the Agency's eyes – upon the completion of this litigation. The current record does not contain any evidence as to whether Mr. Casella is likely to face hostility if reassigned to FPL post-litigation. On this record, the Court concludes that the Agency is likely to reassign Mr. Casella to FPL. Defendants may, however, provide the Court with evidence challenging this conclusion at later stages of the litigation.

Defendants' argument as to the second contingency stems primarily from the assumption that a government actor will not repeat alleged misconduct. That presumption is rebuttable.

*Troiano*, 382 F.3d at 1283. One of the ways in which a litigant can rebut the presumption is through allegations of past misconduct. *See Church v. City of Hunstville*, 30 F.3d 1332, 1337-40 (11th Cir. 1994) (holding that homeless plaintiffs' allegations of past constitutional violations by the city established a significant likelihood of future violations). Whether the allegations of past misconduct establish a likelihood of future injury is a context-specific inquiry that depends on the allegations of the particular case. *See id.*; *Browning*, 522 F.3d at 1161.

Defendants also rely heavily on *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S. Ct. 1660 (1983). The plaintiff in *Lyons* sought to enjoin Los Angeles police officers from using a chokehold that officers had used against him during a traffic stop. *Lyons*, 461 U.S. at 97-98. The Supreme Court held that the plaintiff's injunctive standing depended on whether he was likely to suffer future injury from a police chokehold, which was too speculative. *Id.* at 105-06. The Court wrote:

> In order to establish an actual controversy in this case, [the plaintiff] would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter . . . or (2) that the City ordered or authorized police officers to act in such manner.

*Id.* (emphasis in original). The *Lyons* court also stressed that the plaintiff's ability to avoid future encounters by not breaking the law was key to its decision. *Id.* at 105.

The Eleventh Circuit has distinguished *Lyons* and upheld standing on four occasions.[5] These cases distinguish *Lyons* on two main grounds: 1) the plaintiff's ability to avoid future injury and 2) the relative improbability of the events necessary for a repeated injury. *See Browning*, 522 F.3d at 1162.

---

[5] *Browning*, 522 F.3d at 1162-63; *31 Foster Children*, 329 F.3d at 1266; *Church*, 30 F.3d at 1337-40; *Lynch v. Baxley*, 744 F.2d 1452, 1456-57 (11th Cir. 1984).

This case is obviously distinguishable from *Lyons* on the first ground. The plaintiff in *Lyons* could avoid future contact with the police by not breaking the law. *Lyons*, 461 U.S. at 105. By contrast, FPL is required to have a FSIS inspector at its facility in order to sell its meat in interstate commerce, and must admit the inspector the Agency sends. 9 C.F.R. 300.6(a)(1). The Defendant Agency maintains that it has the right to reassign Mr. Casella to FPL. The wrongful conduct of which FPL complains did not flow from a regulatory violation committed by FPL or its employees. Thus, unlike the plaintiff in *Lyons*, FPL and its employees cannot avoid Mr. Casella's alleged misconduct by not breaking the law.

This case is also distinguishable from *Lyons* on the second ground. The Court has already found that the Agency is likely to reassign Mr. Casella to FPL. FPL has also alleged sufficient facts to overcome the presumption that Mr. Casella will not repeat the wrongful conduct in the future. Key to this finding are the allegations of Mr. Casella's retaliatory actions when confronted about his alleged harassment and the USDA's decision not to take any action against him.

FPL alleges in its Second Amended Complaint that Mr. Casella's misconduct grew bolder after he was confronted about his misconduct. FPL claims that Mr. Casella threatened its employees that he could shut down the plant if they complained about his conduct. FPL also claims that, after Mr. Aviles confronted Mr. Casella, Mr. Casella intentionally interfered with Mr. Aviles's job performance so severely that FPL had to constantly move him to different workstations and shut down one of its lines. These allegations, if true, describe a person who reacts strongly and aggressively when confronted about his conduct. It is reasonable to assume that such a person would react similarly after being sued in federal court. These allegations,

therefore, are sufficient to establish a substantial likelihood of future misconduct at this stage of the litigation.

FPL alleges that the USDA's finding that Mr. Casella did not commit the misconduct alleged in this lawsuit was arbitrary and capricious. That is essentially an allegation that the USDA did not take seriously the allegations and has done nothing to prevent future misconduct by Mr. Casella. The Eleventh Circuit has distinguished *Lyons* and upheld standing on three occasions where the defendants allowed the alleged constitutional violations to continue. *See 31 Foster Children*, 329 F.3d at 1266 ("The alleged systemic deficiencies in the Florida foster care system are similar to an injurious policy, and different from the random act at issue in *Lyons*."); *Church*, 30 F.3d at 1339 ("This case is therefore distinguishable from *Lyons*, where the alleged policy did not necessarily authorize the constitutional deprivation Lyons suffered. If true, the plaintiff's allegations in this case would establish a substantial likelihood that, absent an injunction, the City will continue to act in a similar manner toward them in the future."); *Lynch*, 744 F.2d at 1457 (holding that Alabama officials were likely to continue using county jails to detain persons awaiting involuntary commitment hearings).

The USDA's "no action" determination is distinguishable from those Eleventh Circuit decisions in that FPL has not alleged that the USDA has a policy or practice of permitting employees to suppress free speech and commit sexual harassment. FPL, however, is not alleging that USDA inspectors generally commit that sort of misconduct. Rather, FPL alleges that the USDA did nothing to stop one particular inspector from doing so. If the USDA's factual determination was as arbitrary as FPL alleges, the probability that Mr. Casella would commit future misconduct is markedly increased. There are really two avenues by which FPL can challenge Mr. Casella's misconduct: through the administrative review process of FSIS Directive

4735.7, and in court. FPL alleges that the administrative review was insufficient to prevent Mr. Casella from causing it future harm. If the Court denied standing to pursue an injunction, that would remove the only other means by which FPL could prevent future misconduct.[6] Thus, an inspector with a propensity to retaliate and intimidate would feel emboldened.[7]

Both contingencies on which FPL's allegations of future injury depend – that the USDA might reassign Casella to FPL and that Casella might harass and retaliate against FPL's employees -- are sufficiently probable to render this dispute a "case or controversy." The future injury would be caused by assigning Mr. Casella to FPL, since it is likely that he would repeat his past misconduct. An injunction would redress that injury, because it would prevent the USDA from reassigning Mr. Casella to FPL. FPL therefore has standing to pursue an injunction.

### B.    Committed to Agency Discretion

The Administrative Procedure Act contains a broad presumption of judicial review of final agency action. 5 U.S.C. § 702. It also contains two important exceptions to this presumption: (1) when "statutes preclude judicial review,"[8] and (2) when "agency action is committed to agency discretion by law."[9] At issue here is the latter exception.

The Court agrees with Defendants' assertion that the decision of where to place which employees is one committed to agency discretion. Defendants argue that such decisions are similar to personnel actions, which are committed to agency discretion. It is, however, "well settled that an agency . . . must adhere to voluntarily adopted, binding policies that limit its discretion." *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987) (citing *Vitarelli v. Seaton*, 359

---

[6] The Court later dismisses FPL's Declaratory Judgment Act and *Bivens* claims. *See infra*, Discussion §§ III and IV.
[7] The Court stresses that the allegations against Mr. Casella are merely that: unfounded accusations. FPL may or may not be able to prove these. At this stage, however, the Court takes the allegations as true. Nothing in this opinion should be read as an indictment on Mr. Casella's character or as establishing that he actually committed the wrongful acts alleged.
[8] 5 U.S.C. § 701(a)(1).
[9] 5 U.S.C. § 701(a)(2).

U.S. 535, 539, 79 S. Ct. 968 (1959) and *Service v. Dulles*, 354 U.S. 363, 372, 77 S. Ct. 1152 (1957)).

The petitioner in *Vitarelli* was suspended from his job in the Department of the Interior after he was accused of having sympathetic ties to members of the Communist Party. *Vitarelli*, 359 U.S. at 536-37. Vitarelli filed an answer to the charges and appeared before a security board hearing. *Id.* at 537. After the hearing, the Secretary of the Interior sent Vitarelli a notice of dismissal, which stated "that the dismissal was 'in the interest of national security[.]'" *Id.* Vitarelli then filed suit against the Secretary, alleging that his hearing did not comply with the procedural requirements of Department of the Interior Order No. 2738, which set forth procedural prerequisites for firing employees on national security grounds. *Id.* at 537-39. The Secretary responded that he could fire Vitarelli at any time, without giving a reason. *Id.* at 539. The Supreme Court held that, though the Secretary was correct as a general matter, he had to comply with the Department's voluntarily adopted order because he gave national security as a reason for Vitarelli's dismissal. *Id.* Thus, the Supreme Court held that the agency had to abide by its order limiting its discretion to take a personnel action.

FPL claims that FSIS Directive 4735.7 is a binding source of law to which the Agency Defendants must abide.[10] The Agency Defendants counter that the Directive is merely an internal guidance on how to handle industry complaints and was never intended to bind the agencies. Directive 4735.7 is an agency pronouncement, not a regulation. Unlike regulations, not all pronouncements are binding. *Padula*, 822 F.2d at 100. Under the APA, the Court may

---

[10] FPL also alleges that Defendants' actions were not in accordance with Title VII of the Civil Rights Act or 42 U.S.C. § 1981. Neither of these statutes help FPL. FPL cannot rely on Title VII because it has not complied with the procedural requirements to bring suit under that act – such as presenting the claims to the EEOC or the Attorney General. 42 U.S.C. § 2000e-5(f)(1); 42 U.S.C. § 2000e-16(d). Section 1981 is unavailable because it only covers actions taken under color of state law, not federal. *Lee v. Hughes*, 145 F.3d 1272, 1277 (11th Cir. 1998).

only review agency action taken pursuant to an agency pronouncement if the pronouncement is binding. *Id.* The Court must therefore determine whether the Directive is binding. It is.

The Eleventh Circuit has not addressed the circumstances under which an agency pronouncement is binding. However, the D.C. Circuit and at least three other circuit courts have. All four circuits held that agency pronouncements are only binding when the agency intended to be bound by the pronouncement. *Id.*; *Ngure v. Ashcroft*, 367 F.3d 975, 982-83 (8th Cir. 2004); *Smirko v. Ashcroft*, 387 F.3d 279, 295 (3d Cir. 2004); *Mass. Pub. Interest Research Group, Inc. v. U.S. Nuclear Regulatory Comm'n*, 852 F.2d 9, 18 (1st Cir. 1988). The D.C. Circuit determines agency intent by looking "to the present effect of the agency's pronouncement[]" to see whether it imposes "significant restraints on the agency's discretion." *Padula*, 822 F.2d at 100. This Court finds these decisions persuasive, and applies the rule that pronouncements bind the agency when the agency intends them to be binding. The Court will look primarily to the text of the Directive in undertaking this inquiry. It will also look at the relationship between the agency's actions and the Directive. Dr. Smith's and Ms. Hicks's letters are the most reliable evidence of this relationship before the Court.

The Directive, issued by the FSIS (a subsidiary agency of the USDA), is titled "Industry Complaints Against FSIS Program Employees." It contains both substantive and procedural sections. On the substantive side, it states that "[p]rogram employees must display professional behavior and conduct their regulatory duties in a fair, unbiased, equitable, and non-retaliatory manner." It defines a "Formal Complaint" as "[a]n industry official's charge of wrongdoing by a program employee. **EXAMPLES:** Assault, harassment, interference, intimidation, retaliation, threat, or other misconduct. Formal Complaints are generally in writing and may require a formal response." (emphasis in original). It defines *harassment* as "[a]n act or behavior to

annoy or torment repeatedly and persistently"; *interference* as "[a]n act or behavior to hamper, hinder, block, resist, oppose or impede the actions or activities of another person"; *intimidation* as "[a]n act or behavior to compel or deter action by coercion, extortion, duress, or threat"; *retaliation* as "[a]n activity perceived as an action to get even or to control a particular situation or business relationship"; and *threat* as "[a]ny gesture or verbal or written expression that conveys intent to cause physical or non-physical harm to the individuals or their property."

Also set forth in the substantive section of the Directive is the Directive's coverage: "This directive covers the policies and procedures that apply when a regulated industry representative complains about an Agency employee."

The procedural section establishes the procedures for filing a complaint, an initial decision, and an appeal. That section provides that formal complaints are to be submitted to "the supervisor or [district manager], in writing, with specific accusations against a program employee." The complaint must include the name of the complainant, the name of the agency employee, a detailed statement of the accusations, and an explanation of any prior attempts to resolve the complaint. The accused agency employee is then advised of the complaint. The supervisor or district manager then determines whether to conduct an initial review or request a formal investigation. After conducting an initial review or upon the completion of a formal investigation, the district manager determines the assignment status of the agency employee. The manager's options are: "a. [n]o change in assignment[;] b. [d]etail employee to another assignment[; or] c. [p]lace employee on administrative leave."

The Directive also provides for an appeal process. If the complainant "is dissatisfied with the [district manager's] resolution of the complaint," the complainant may appeal to the Executive Associate for Regulatory Operations. The Executive Associate may either affirm the

district manager's resolution or take further action.  Upon completion of the investigation, the Executive Associate must send the complainant a letter setting forth the outcome of the inquiry.

These policies and procedures are much more indicative of binding requirements than mere internal guidelines.  Moreover, the Directive does not say that agency officials *should* follow the procedures; it says that agency "officials *must* follow the procedures."  (emphasis added).  The use of *must* rather than *should* or *may* indicates an intent to be bound.  The same paragraph also limits the agency's substantive discretion: "Supervisory officials *must* incorporate the work relationship principles into resolutions."  (emphasis added).  The Directive's statement of its coverage is also consistent with an intent to be bound.  It states  that the Directive "covers the policies and procedures that apply" – not that it provides guidance on how to handle future complaints.

This is not a case where the Court has "no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S. Ct. 814 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S. Ct. 980 (1977).  FPL's main allegation in Count One is that the USDA's factual conclusion and no action determination were arbitrary and capricious. FPL filed a formal complaint with the USDA in which it alleged that Mr. Casella harassed, intimidated, assaulted, threatened, and retaliated against its employees.  (2d. Am. Compl. Ex. 13 ¶ 3.)  All of these terms are defined in the Directive.  The Court can examine the evidence before the USDA officials and judge it against the substantive standards of the Directive to determine whether their conclusions were arbitrary and capricious.

Dr. Smith's letter to FPL's counsel indicates that he viewed the Directive as binding.  Dr. Smith stated in his letter that, upon receiving the complaint, he requested a formal investigation due to the serious nature of the allegations.  The investigators conducted an investigation, and

made a "No Action" determination. Dr. Smith therefore concluded that Mr. Casella should be reassigned to FPL. All of these actions are authorized in the procedural section of the Directive. Dr. Smith then informed FPL that "[i]f [his] decision does not meet with your satisfaction, your options are addressed in FSIS Directive 4735.7. . . . Specifically, you may appeal my decision to: Ms. Cheryl A. Hicks[,] Executive Associate for Regulatory Operations[.]" (2d Am. Compl. Ex. 14.) That is the appeal process provided for in the Directive. Thus, Dr. Smith followed the precise procedures set forth in the Directive, and referenced the Directive when he informed FPL of its options. That indicates that Dr. Smith viewed the Directive as binding.

Ms. Hicks's letter to FPL also indicates that she viewed the Directive as binding.[11] Ms. Hicks wrote in the second paragraph of her letter: "As outlined in the FSIS Directive 4735.7 . . ., if a firm is dissatisfied with the decision made at the District Office level . . . that firm may appeal the District level decision to the headquarters level." (2d. Am. Compl. Ex. 16, 2.) That language indicates that the Directive established a right-of-appeal for a complainant. If the Directive creates a right to appeal for the complainant, it must also create an obligation on the agency to hear the appeal. In other words, the Directive binds the Agency to hear the appeal.[12]

Both the Directive's text and the way in which the USDA officials viewed their obligations under it are consistent with an intent to be bound. The Court therefore holds that the FSIS and USDA are bound by the substantive and procedural sections of the Directive.

---

[11] The Court recognizes that Defendants submitted a Declaration by Ms. Hicks, in which she stated that the Directive is more of an internal guideline than a binding procedure. The Court considered that Declaration when issuing its withdrawn order. That reliance was erroneous. The Declaration was not attached as an exhibit to FPL's complaint, was not central to FPL's Complaint, and is not the type of document of which the Court may take judicial notice. Moreover, the Declaration is only of slight evidential value. The Declaration was sworn to on December 12, 2008, months after this litigation began. Ms. Hicks's letter and activities while she was acting pursuant to the Directive are of much greater probative value than a post-complaint declaration filed after the issues have been framed in the complaint.

[12] Ms. Hicks wrote in a later paragraph that "[w]hen the appeals from industry involve alleged misconduct, FSIS Directive 4735.7 outlines the specific process to be followed, and authority to respond on behalf of FSIS headquarters level has been delegated to the Executive Associate for Regulatory Operations." (*Id.* at 3.) That language is also consistent with the conclusion that the Directive sets forth binding norms.

## C.     Exhaustion

The Agency Defendants argue that Count One should be dismissed because FPL has not exhausted the administrative remedies for appealing noncompliance records.  FPL does not seek review of a noncompliance record; it seeks judicial review of its complaint against an agency employee.  Therefore, the administrative remedies set forth in the Directive, not the regulations related to noncompliance records, must be exhausted.  *See* FSIS Directive 4735.7 § 1(VI)(A) ("FSIS regulations provide establishments the opportunity to appeal, orally and in writing, an inspection finding or regulatory decision made by an FSIS employee. . . . This directive **does not apply to industry appeals** which follow a separate process.") (emphasis in original).  Ms. Hicks's December 17, 2007 letter acknowledges as much: "it was agreed by your law firm and the US Department of Justice (DOJ) attorneys assigned to the case that the administrative appeal process for these matters, as set forth in FSIS Directive 4735.7, would be first exhausted prior to the complaint to the District Court being heard."  (2d. Am. Compl. Ex. 16, 3.)  FPL has exhausted the administrative remedies set forth in the Directive.  The case is therefore ripe for judicial review.

In sum, FPL has standing to pursue an injunction, the Directive is binding, FPL has exhausted its administrative remedies, and sovereign immunity does not bar Count One.  Defendants' Motion to Dismiss Count One is therefore **DENIED**.


## III.     Count Two

In Count Two, FPL seeks declaratory relief under the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201, 2202.   Like the APA, the DJA is a procedural statute only.  *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 138, 127 S. Ct. 764 (2007).  It confers no new

substantive rights or obligations, but merely provides a different avenue for bringing a dispute before the judiciary. *Id.*

FPL asks the Court to declare that if Mr. Casella returns to FPL, his continued harassment of FPL's employees would subject FPL to liability under Title VII and 42 U.S.C. § 1981. (Compl. ¶ 38.) FPL cites *Pavey v. Univ. of Alaska*, 490 F. Supp. 1011 (D. Alaska 1980), for the proposition that one may maintain a declaratory judgment action in federal court where one cannot simultaneously comply with two federal laws. *Id.* at 1013-14. That proposition does not apply here. FPL argues that federal law requires it to have an FSIS inspector at its facility to lawfully sell its wares in interstate commerce, but that it would violate Title VII and section 1981 by allowing Mr. Casella in its facility. FPL, however, does not legitimately face Title VII or section 1981 liability.

Employers can be held liable under Title VII for the unlawful acts of third parties in limited circumstances. *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 n.2 (11th Cir. 2003). For two reasons, however, FPL is exceedingly unlikely to be held liable under Title VII for Mr. Casella's misconduct.

First, employers can only be held liable for a hostile work environment claim if they "fail[] to take immediate and appropriate corrective action." *Watson*, 324 F.3d at 1257. The Eleventh Circuit has "held that warnings and counseling of the harasser are enough [to constitute immediate and appropriate corrective action] where the allegations are substantiated." *Baldwin v. Blue Cross/Blue Shield*, 480 F.3d 1287, 1305-06 (11th Cir. 2007). Here, FPL exhausted its administrative remedies and has initiated and vigorously prosecuted a complex lawsuit to remove Mr. Casella from its premises. Those actions are much more forceful than "warning[] and

counseling [] the harasser." *Id.* FPL has therefore taken "immediate and appropriate corrective action" that would bar Title VII liability. *Watson*, 324 F.3d at 1257

Second, FPL's relationship with Mr. Casella is probably too remote for FPL to be held liable for Mr. Casella's acts. In most cases finding an employer liable under Title VII for a third party's acts, the employer has either had some role in the discrimination or has profited in some way from its relationship with the discriminating party. *See, e.g., Ariz. Governing Comm. for Tax Deferred Annuity v. Norris*, 463 U.S. 1073, 1089-91, 103 S. Ct. 3492 (1983) (employer benefitted from voluntary relationship with discriminating party); *Watson*, 324 F.3d at 1261 (harassing parties were customers and employees of employer). "To establish employer responsibility for the discriminatory programs of third parties, the employer must be more than a broker, or other intermediary, that simply enables its employees to enter into arrangements with third parties; the employer must affirmatively, actively participate in the third-party program." *Morgan v. Safeway Stores, Inc.*, 884 F.2d 1211, 1214 (9th Cir. 1989); *Lantz v. Hosp. of U. of Penn.*, No. 96-2671, 1996 WL 442795, at *7-8 (E.D. Pa. July 30, 1996).

According to the allegations of the Complaint, FPL's relationship with Mr. Casella was neither voluntary nor beneficial. It was involuntary and, according to FPL's allegations and documentary evidence, harmful. Unlike the cases in which an employer could have discharged harassing employees or refused to conduct business with harassing customers, FPL could not avoid Casella if it wanted to conduct its business lawfully. Further, FPL derived no benefit from its relationship with Mr. Casella. The presence of an FSIS inspector – like Mr. Casella – allowed FPL to ship its meat in interstate commerce, which is a benefit. Mr. Casella's misconduct, however, allegedly caused FPL economic harm, and FPL clearly prefers to have a different inspector stationed at its plant. Because FPL's relationship with Casella was involuntary and

disadvantageous, it is extremely unlikely that FPL would face Title VII liability for Casella's acts.

FPL does not face section 1981 liability because that statute only prohibits intentional discrimination committed by the defendant. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 394-97, 102 S. Ct. 3141 (1982). Section 1981 does not require employers to protect its employees against discrimination by third parties, like Mr. Casella. *Id.* FPL does not claim that *it* will discriminate intentionally against its employees if Mr. Casella is returned to its facility. FPL, therefore, does not face section 1981 liability. Thus, FPL can comply with federal laws requiring it to have a meat inspector stationed at its facility without violating Title VII or Section 1981. The Court therefore **GRANTS** Defendants' Motion to Dismiss Count Two.


## IV. Counts Three and Four

FPL asserts *Bivens* claims[13] against Mr. Casella in his individual capacity in Counts Three and Four. FPL claims in Count Three that Mr. Casella violated FPL's and its employees' First Amendment right to complain about his conduct by engaging in threatening and retaliatory behavior after a few of FPL's employees confronted Mr. Casella about his misconduct. (2d Am. Compl. ¶ 42.) FPL claims in Count Four that Mr. Casella violated its employees' Fifth Amendment equal protection rights. (2d Am. Compl. ¶ 47-54.) Mr. Casella moves to dismiss

---

[13] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971). A *Bivens* claim is a claim for monetary damages against federal officials and employees asserted directly under the Constitution. *See Wilkie v. Robbins*, 551 U.S. 537, 549-50, 127 S. Ct. 2588 (2007).

both counts on the grounds that FPL does not have standing to raise its employees' constitutional rights.[14]

The Court's initial order, which has been withdrawn, held that FPL had standing to assert its employees' constitutional claims. After a thorough review, the Court now concludes that this holding was erroneous. The Court holds that FPL does not have standing to challenge violations of its employees' constitutional rights. Counts Three and Four are therefore dismissed.

Because Mr. Casella challenges standing via a motion to dismiss, FPL "may establish standing based on general factual allegations of injury." *Young Apartments*, 529 F.3d at 1038.[15] The Court must also presume that FPL's "allegations are sufficient to establish the facts alleged." *Id.* The Court, however, is not required to accept legal conclusions and conclusory statements as true. *See Iqbal*, 129 S. Ct. at 1949-51 (discussing *Twombly*, 550 U.S. 544, 127 S Ct. 1955).

Every plaintiff must satisfy the Article III "case or controversy" standing requirements. *See Young Apartments*, 529 F.3d at 1038 (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197 (1975)). The Article Three requirements are that "(1) [the plaintiff] has suffered an actual or threatened injury, (2) that the injury is fairly traceable to the challenged conduct of the defendant, and (3) that the injury is likely to be redressed by a favorable ruling." *Id.* (quoting *Harris*, 20 F. 3d at 1121). These requirements are constitutional, and the Court cannot proceed unless they are satisfied. *Laidlaw*, 528 U.S. at 181, 120 S. Ct. 693.

There are three prudential limitations on standing in addition to the Article III requirements: "a plaintiff cannot raise the claims of third parties; cannot claim standing based on

---

[14] Mr. Casella also moves to dismiss Count Three on the grounds that FPL does not have standing to raise its own First Amendment claim. (Def.'s Br. Supp. Mot. Dismiss 18-22.) FPL appears to have abandoned this theory of standing. In its Response, FPL only asserted its individual standing to pursue declaratory relief (Count Two) and relationship standing to assert the rights of its employees in Counts Three and Four. Moreover, FPL has not alleged that Mr. Casella retaliated against it for exercise of its corporate speech. The Court therefore limits its inquiry to third-party standing and holds that FPL does not have individual standing to pursue Count Three.

[15] Neither Party has submitted evidence outside of the Complaint relevant to FPL's standing to bring Counts Three and Four.

a generalized grievance; and must raise a claim within the zone of interest covered by a statutory conferral of standing." *Eland*, 471 F.3d at 1206. The prudential limitations are not constitutional in origin, but are nevertheless important in ensuring that federal courts hear actual cases between the proper parties to the dispute. *Harris*, 20 F.3d at 1123. The first prudential limitation – that a plaintiff cannot assert the rights of others – is at issue here.

Before examining the prudential limitations, the Court must determine whether FPL has Article III standing based on Mr. Casella's violations of FPL's employees' constitutional rights. It clearly does. FPL alleges that Mr. Casella's actions decreased the efficiency of its plant, caused it to shut down an entire portion of its plant for one week, and adversely affected employee morale. These are actual economic losses that, if proven, would satisfy the injury-in-fact requirement. *See Young Apartments*, 529 F.3d at 1038. The second requirement is that there must be a causal connection between the action and the injury. FPL alleges in Count Three that it had to shut down its head rework line and continuously move certain employees to different stations because of Mr. Casella's retaliatory actions against employees who complained of his misconduct. FPL alleges in Count Four that Mr. Casella's sexual harassment and racial discrimination led to decreased worker productivity and created the need to reassign employees, both of which contributed to FPL's economic losses. These allegations meet the causal connection requirement. The third requirement – redressability – is also met. Monetary damages would compensate FPL for its economic losses and deter Mr. Casella and other USDA employees from engaging in harassing and intimidating conduct in the future. *See Laidlaw*, 528 U.S. at 186, 120 S. Ct. 693 ("To the extent [monetary damages] encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress . . . .").

FPL and Mr. Casella disagree over the proper test for determining whether an employer has standing to assert the rights of its employees. Mr. Casella argues that the associational standing test of *White's Place, Inc. v. Glover*, 222 F.3d 1327 (11th Cir. 2000) governs. FPL claims that the third-party standing test of *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800 (11th Cir. 1993) controls. Both of these cases involve employer-employee relationship standing. In *White's Place*, a strip club argued that a Florida statute making it a misdemeanor to "resist or oppose a police officer" violated its employees' First Amendment rights. *White's Place*, 222 F. 3d at 1328, 1330. In *Region 8*, a group of timber companies attempted to "rely on their employees' interest in the environment" to challenge actions taken by the Forest Service to protect endangered woodpeckers. *Region 8*, 993 F.2d at 810.[16]

*Region 8* – decided in 1993 – differentiated between third-party and associational standing. 993 F.2d at 810 n.15. It stated that the proper test for third-party standing premised on the employer-employee relationship is the test set forth in *Singleton v. Wulff*, 428 U.S. 106, 96 S. Ct. 2868 (1976), not the associational test set forth in *Hunt v. Washington State Apple Advertising. Commission*, 432 U.S. 333, 97 S. Ct. 2434 (1977). *Region 8*, 993 F.2d 809-10 n. 15. Thus, *Region 8* held that third-party standing was available "when (1) the plaintiff seeking to assert the third party's rights has otherwise suffered an injury-in-fact, (2) the relationship between the plaintiff and the third party is such that the plaintiff is nearly as effective a proponent of the third party's right as the third party itself, and (3) there is some obstacle to the third party asserting the right." *Id.* at 809. The court stated that the associational test is only

---

[16] The *Region 8* case is one of the more absurd attempts by an employer to assert the rights of its employees. Most reported employer-employee standing cases involve a strip club asserting the First Amendment rights of erotic dancers. Third-party standing in that context makes sense, as both the owner and employee suffer an economic injury resulting from the law or ordinance. But the employers in *Region 8* argued that new environmental regulations harmed their employees' interest in the outdoors because the timber companies were not allowed to cut down as many trees. 993 F. 2d at 809-10. Unless the employees were severely allergic to pollen, it's hard to see how fewer trees would further their interest in the outdoors.

appropriate "for voluntary membership organizations – like trade associations or environmental groups – and has no application to a corporation's standing to assert the interests of its employees." *Id.* at 810 n.15.

The Eleventh Circuit has used the third-party standing test articulated in *Region 8* at least twice since it was decided (though neither case cites *Region 8*). Sitting *en banc*, the court used the third-party standing test when a prisoner asserted the First Amendment rights of prison employees to communicate directly with the parole board. *Harris*, 20 F.3d at 1122. *Harris* is particularly relevant since the court in that case could have overruled *Region 8*, as it was sitting *en banc*. An Eleventh Circuit panel used the test in *Young Apartments*, the Eleventh Circuit's most recent third-party standing case, in which a low-rent apartment owner asserted the equal protection rights of its immigrant tenants. 529 F.3d at 1041-42.

In 2000, a different Eleventh Circuit panel took a crack at a seemingly similar issue, in *White's Place*. But curiously, the *White's Place* court analyzed whether the employer had standing to assert the rights of its employees under the heading "*Associational Standing*." 222 F.2d 1330 (emphasis in original). And it used the associational test set forth in *Laidlaw*: "[the association's] members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *White's Place*, 222 F.3d 1330 (quoting *Laidlaw*, 528 U.S. at 181, 120 S. Ct. 693). The quoted language is supported in *Laidlaw* by a citation to *Hunt* – the Supreme Court case that the *Region 8* court said did not apply in the employer-employee context.[17]

---

[17] A good argument can be made that the third-party standing discussion in *Region 8* and the associational standing discussion in *White's Place* – to the extent *White's Place* confused associational and prudential standing – were both dicta. Both courts held that the plaintiffs in their respective cases did not suffer an injury in fact. Thus, neither plaintiff had Article III standing. Because third-party, prudential considerations cannot be used to overcome Article

The Court rejects Defendants' repeated assertion that the *White's Place* associational standing test governs this dispute. Defendants correctly point out in their Reply Brief that the associational standing test is an Article III test, but that the third-party standing test of *Region 8* is prudential. But FPL does not claim associational standing; it claims to have Article III standing in its own right and prudential standing to assert the rights of its employees. Associational standing is therefore irrelevant to this dispute.

Defendants' argument that *White's Place* governs is two-fold: (1) it was decided after *Region 8* and (2) it involved a business asserting the constitutional rights of its employees. Both are true; neither help Defendants. In the historic case of *Bonner v. City of Prichard*, the newly-formed Eleventh Circuit adopted the Fifth Circuit rule that a prior circuit decision can only be overruled by the court sitting *en banc*, not by a panel. 661 F.2d 1206, 1209 (11th Cir. 1981). This rule has been affirmed in more recent cases. *See, e.g., Local Union 48 Sheet Metal Workers v. S.L. Pappas & Co.*, 406 F.3d 970, 975 (11th Cir. 1997).

There are two possible explanations for the *White's Place* court's reliance on associational standing rather than third-party prudential standing. The most plausible reason is that the plaintiff knew it had not suffered an injury-in-fact, so it had to try to rely on the injuries of its employees. Because prudential standing cannot be used to overcome a lack of Article III standing, the plaintiff had to rely on associational standing. In that case, *White's Place* is distinguishable from this case and does not govern, as FPL has Article III standing. The other possibility is that the *White's Place* court erroneously used the associational standing test to

---

III requirements, the discussion of such considerations in both cases was irrelevant to the actual holdings, *i.e.*, dicta. In that case, *Harris* and *Young Apartments* govern, both of which used the same test as *Region 8*. If *White's Place* was truly an associational standing case, and *Region 8* was dicta, *Harris* and *Young Apartments* would still govern, as *White's Place* would be irrelevant to this dispute and *Region 8* dicta. But none of this changes the result that the third-party test of *Region 8* and not the associational test of *White's Place* governs this dispute. Hence, this footnote could fairly be termed a "dictum about dicta." *Carey v. Musladin*, 549 U.S. 70, 79, 127 S. Ct. 649 (2006) (Stevens, J., concurring).

make a third-party prudential standing determination. If that is the case, *White's Place* directly contradicts *Region 8* and *Harris*.[18] Because *Region 8* and *Harris* were decided before *White's Place*, and the *White's Place* panel could not overrule either, *Region 8* and *Harris* control unless an intervening Supreme Court or Eleventh Circuit *en banc* decision casts doubt upon their holdings. *See Bonner*, 661 F.2d at 1209. None has.

Laidlaw was the only Supreme Court decision cited in the associational standing portion of *White's Place*. *White's Place*, 222 F.3d at 1330. The plaintiffs in *Laidlaw* were all environmental groups and were suing the defendant under the citizen suit provision of the Clean Water Act. *Laidlaw*, 528 U.S. at 175-77. That is the type of scenario envisaged by the *Region 8* court in which the *Hunt* test would be appropriate: an environmental group suing on behalf of its voluntary members to protect the environment. *Region 8*, 993 F.2d at 810 n.15. Thus, nothing in *Laidlaw* casts doubt upon the holding in *Region 8*. The only Eleventh Circuit case cited in this portion of *White's Place* has absolutely nothing to do with standing. *White's Place*, 222 F.3d at 1330 (citing *David Vincent, Inc. v. Broward County*, 200 F.3d 1325 (11th Cir. 2000)). This Court has not found any other cases that would have justified the departure. Thus, no intervening change in Eleventh Circuit or Supreme Court law justified *White's Place*'s departure from *Region 8* and *Harris*. The Court will therefore apply the third-party prudential test found in *Region 8*, *Harris*, and *Young Apartments*.

FPL has Article III standing. But because FPL is asserting the claims of its employees rather than its own claims, it must also overcome that prudential limitation on standing. *See Harris*, 20 F.3d at 1121. To overcome the prudential limitation, FPL must show: 1) that it has suffered an injury-in-fact; 2) that its relationship with its employees is sufficiently close; and 3)

---

[18] *Harris* did not involve an employer asserting the rights of its employees, so *White's Place* is more factually analogous. However, *Harris* spoke of third-party standing in general, and *White's Place* did not cite the *Harris* rule or indicate that it was creating a special rule when an employer asserts the rights of its third-party employees.

that there exists some hindrance to the employees' ability to pursue their own claims. *Id.* at 1122; *Region 8*, 993 F.2d at 809. FPL has only made the first showing.

## 1.    Injury-in-Fact

The injury-in-fact showing required to overcome the third-party prudential limitation is essentially the same as the injury-in-fact showing required for Article III standing. *See, e.g.*, *Young Apartments*, 529 F.3d at 1042 ("First, as already noted, Young Apartments has sufficiently alleged that it has a concrete interest in the outcome of this dispute."); *Region 8*, 993 F.2d at 810 ("First, as previously discussed, the Council and the Timber Companies have not suffered an injury in fact."). Clarity would ensue if courts would drop this requirement from the prudential test and reserve it for the Article III test where it belongs. If a plaintiff has not suffered an injury, it will not have Article III standing, and prudential considerations will be irrelevant. If a plaintiff has suffered an injury-in-fact, there is no need to repeat this fact in different portions of the standing analysis. Nevertheless, as discussed above, FPL has alleged a sufficient economic injury to satisfy this requirement. *See, Young Apartments*, 529 F.3d at 1042 (holding that an economic injury is sufficient to meet the injury-in-fact requirement for third-party standing).

## 2.    Sufficiency of the Relationship

The relationship between FPL and its employees is not "sufficiently aligned to ensure that [FPL] will properly frame the issues in this dispute." *Id.* The purpose of this showing is to ensure that the plaintiff is as effective a proponent as the third party. *Harris*, 20 F.3d at 1994. *Region 8* seemed to indicate that an employer-employee relationship is never close enough to confer third-party standing. *Region 8*, 993 F.2d at 810 ("In cases allowing third-party standing, the relationship between the party asserting the right and the third party has been characterized

by a strong identity of interests which is absent in an employer/employee relationship."). Other circuits have, however, upheld third-party standing in the employer-employee context, and this circuit recently upheld standing in the landlord-tenant context, which arguably is not as close as the employer-employee relationship. The Court therefore does not rely on this language in *Region 8* in concluding that FPL has not met the "sufficiency of the relationship" requirement. Nonetheless, FPL has not made the required showing.

The Eleventh Circuit and Supreme Court have upheld third-party standing when a business claimed that the violation of a third-party's equal protection rights caused the business economic losses. But the relationship in those cases between the business, third party, and constitutional violation were closer than they are here. In *Young Apartments*, the plaintiff-apartment owner claimed that the town was "targeting Hispanic immigrants by taking measures against their landlords." *Young Apartments*, 529 F.3d at 1034. The Eleventh Circuit allowed the apartment owner to assert the equal protection rights of its immigrant tenants. *Id.* In *Craig v. Boren*, two Oklahoma statutes prohibited the sale of 3.2% alcohol "nonintoxicating" beer to males under the age of twenty-one and females under the age of eighteen. 429 U.S. 190, 191-92, 97 S. Ct. 451 (1976). The Court allowed a vendor to assert the rights of the eighteen-twenty year old males against whom the statute required the vendor to discriminate (the statute punished the selling of beer to minors, not the purchase of beer by minors). *Id.* at 194-95.

Here, by contrast, Mr. Casella's alleged conduct was aimed directly at Ms. Mata, not FPL. He allegedly rubbed *her* buttocks, put his hands inside *her* pockets, and made masturbation gestures in front of *her*. These actions, if true, probably violated Ms. Mata's constitutional rights. They may have also caused incidental economic losses to FPL. But economic losses due to marginal reductions in efficiency and the personal humiliation and distress brought on by

sexual harassment are different things entirely. And this is not a case like *Young Apartments* or *Craig* where the economic losses to the plaintiff can only be redressed by remedying the equal protection violations against the third-parties. In *Craig*, the beer vendor would continue to suffer economic losses so long as 18-20 year old males were denied the right to purchase beer. In *Young Apartments*, the apartment owner would continue suffering losses so long as town officials tried to drive its Hispanic tenants out of town. FPL, by contrast, only suffers an economic injury when Mr. Casella's harassment of its employees causes incidental reductions in plant efficiency. That injury would cease if Mr. Casella harassed the employees in a way that would not hamper their job performance. FPL's injury could therefore be cured without ending the constitutional violation, which makes it less likely that FPL would frame the issues properly, as the Court explains below.

FPL claims in Count Three that Mr. Casella violated its employees' First Amendment "right to complain about his unlawful and wrongful conduct." (2d Am. Compl. ¶ 42.) Courts have recognized third-party standing to assert First Amendment claims in the employer-employee context. FPL cited *Clark v. City of Lakewood*[19] and *Hang On, Inc. v. City of Arlington*[20] in its Response. Both of these cases, however, involved the owners of adult establishments challenging laws that restricted their ability to do business. The plaintiff in *Hang On* owned a topless bar in Texas and was challenging a "no touch" ordinance. *Hang On*, 65 F.3d at 1251. The plaintiff in *Clark* owned a strip club in Washington and was challenging stringent licensing requirements and regulations placed on adult establishments (strip clubs, bookstores, etc.). *Clark*, 259 F.3d at 1001-04. The "congruence of interests" in those cases is much stronger than the employee-employer interests at issue in this case. *See Harris*, 20 F.3d at 1123.

---

[19] 259 F.3d 996 (9th Cir. 2001).
[20] 65 F.3d 1248 (5th Cir. 1995).

The alignment of interests between the strip club owner and its employees regarding no touch ordinances is much closer than that of FPL and its employees regarding the employees' right to complain about an USDA inspector. Like the plaintiffs in *Craig* and *Young Apartments*, the strip club owner can be expected to frame the issues properly because its economic losses will continue until the no touch ordinance is lifted. The employees arguably have the same interest, as they would continue suffering an economic injury until the ordinance is lifted as well. In other words, the economic injury cannot be cured without holding the ordinance unconstitutional, thus ending the First Amendment violation. FPL's economic injury, however, is incidental to, and not inherently caused by, the free speech violation. FPL's injuries stem from Mr. Casella's targeting of certain employees to inspect more thoroughly after they complained about his conduct. Those actions caused FPL losses because the stations at which the employees worked began running slowly, and one had to be shut down.

FPL has a strong interest in preventing Mr. Casella from retaliating against its employees in a way that slows the operations of its factory. It does not, however, have a strong interest in remedying the free speech violation itself. If the retaliatory action – or threatened action – did not have an incidental effect on its operations, FPL's interest in remedying it would be greatly diminished or nonexistent. That is important because it means that FPL is likely to be more interested in the retaliation's effect on its bottom line than on the constitutional violation itself. There is, therefore, a real risk that FPL would not frame properly the First Amendment issues. Hence, FPL does not share the type of "congruence of interest" with its employees that would ensure that the issues would be framed properly. *See Harris*, 20 F.3d at 1123.

### 3.    Third Party's Ability to Protect Rights

The biggest hole in FPL's case is that there are few hindrances in its employees' abilities to bring suit on their own behalf.  Eleventh Circuit cases have focused on two different lines of Supreme Court cases when undertaking this inquiry.  The *Young Apartments* court asked "whether it 'would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court.'"  529 F.3d at 1043 (quoting *Barrows v. Jackson*, 346 U.S. 249, 257, 73 S. Ct. 1031 (1953)).  The court held that the Hispanic tenants' fears of "hostility from the residents of Jupiter" and of "drawing attention to the immigration status of themselves or their neighbors" met this requirement.  *Id.* at 1044.  The *Harris* court asked "whether the rights of the third party will be diluted or infringed if the litigant is not allowed to assert those rights of the third party."  20 F.3d at 1124.  The court could not find a reason why the prison employees could not assert their own rights, and noted that "the policy in question applie[d] directly to the [third party] and only indirectly to [the plaintiff]."  *Id.*

The Court has not found a reason why FPL's employees cannot assert their own rights.  FPL argues that its employees reasonably feared retaliation if they reported Mr. Casella, and that FPL is in a better financial position to bring suit.  Neither of these arguments are persuasive.  FPL argues that Ms. Mata feared that Mr. Casella had the power to shut down the plant if she complained about his misconduct, and that she and Mr. Aviles would lose their jobs.  But FPL fails to explain how it bringing suit rather than Ms. Mata or Mr. Aviles alleviates that concern.  Neither Mr. Casella nor the USDA has the power to fire Ms. Mata, Mr. Aviles, or any other FPL employees – only FPL can do that.  Mr. Casella and the USDA could regulate FPL improperly, and may even be able to shut down the plant, thus making good on Mr. Casella's threat.  But FPL, rather than Ms. Mata, bringing suit does not remedy that concern.  FPL could have assured

Ms. Mata and Mr. Aviles that it would support them if they reported Mr. Casella's conduct, or sued him on their own. FPL could have also guaranteed Mr. Aviles and Ms. Mata that it would protect their jobs if they brought suit. FPL could have told them that Mr. Casella did not have the power to shut down the plant, and that they need not be concerned about that if they wished to assert their constitutional rights. If, after all of these assurances, Ms. Mata and Mr. Aviles still decided that it was not worth filing suit, that would be their right. It was their rights – not FPL's– that were allegedly violated.

The threat of retaliation in *Young Apartments* was of an entirely different order of magnitude than the threats at issue here. The plaintiffs in *Young Apartments* were immigrant laborers living in a town allegedly filled with anti-immigrant fervor. 529 F.3d at 1044. The court held that it was reasonable for them to fear additional hostility from the town's residents, "policing measures" from the town council, and "legal risks" involving their immigration status if they brought suit themselves. All of these repercussions would have been asserted directly against the immigrant tenants by the town citizens and officials, not by the town officials against the plaintiff apartment owner who would then take action against the tenants. But that latter situation is essentially what FPL alleges here: the injured third party would fear that Defendants would take action against FPL who would then fire the third parties, that is, Aviles and Mata. When the actual plaintiff is a necessary intermediary in the feared retaliation, third-party standing is not necessary to assuage the injured person's reprehensions about bringing suit.

FPL's relative financial strength does not justify deviating from the rule that a party cannot assert the rights of others. FPL is probably in a better position to finance this litigation than its employees. But the test is whether it would be "difficult if not impossible" for the employees to bring suit, not whether it would be easier for FPL to do so. *Young Apartments*, 529

F.3d at 1043. FPL's employees may not be wealthy, but they have jobs, and lawyers have creative fee structures, such as contingency fee arrangements. FPL could also hire a lawyer for its employees.[21] FPL's relative financial strength may be a make-weight factor in favor of standing, but it is not enough to overcome the deficiencies in the other third-party standing factors.

FPL has not alleged sufficient facts to support third-party standing to assert the rights of its employees. FPL appears to have abandoned its claim that Mr. Casella violated its First Amendment rights, and has not, in any event, alleged any instances involving retaliation against its corporate speech. Mr. Casella's Motion to Dismiss Counts Three and Four is therefore **GRANTED.**


## V. Counts Five and Six

Counts Five and Six assert state law claims against the USDA. The USDA moves to dismiss these claims as barred by sovereign immunity. The Court issued a stay – at Defendants' request – of all proceedings except for the Motion for Reconsideration. The Court has also ordered a hearing on Defendants' Westfall certification, at FPL's request. That hearing will determine whether Mr. Casella was acting within the scope of his employment when he committed the alleged misconduct. Ruling on Defendants' Motion to Dismiss these Counts before that hearing and determination take place would be premature. The Court therefore **DENIES** Defendants' Motion to Dismiss Counts Five and Six at this time.

---

[21] Georgia Rule of Professional Conduct 1.8(f) allows a lawyer to accept compensation from a non-client if "(1) the client consents . . . (2) there is no interference with the lawyer's independence of professional judgment; and (3) information relating to representation of a client is protected[.]"

**CONCLUSION**

The Court **GRANTS** Defendants' Motion to Dismiss in part, and **DENIES** the Motion in part. Specifically, the Court **DISMISSES** Counts Two, Three, and Four of FPL's Second Amended Complaint, but **DOES NOT DISMISS** Counts One, Five, Six, and Seven. The Stay of Proceedings pending Reconsideration is **LIFTED**.

The Court will hold an evidentiary hearing to resolve the issue of substituting the United States for Gary Casella with regard to Plaintiff's state law claims, as FPL requested. The Court will schedule that hearing after consultation with the Parties.

**SO ORDERED**, this  12th  day of November, 2009.

_____
HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA